IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA N. HERNANDEZ,<br><br>    Plaintiff,<br><br>v.<br><br>ANTHONY HEDGPETH, WARDEN<br><br>    Defendant.<br>_____/ | No. C 10-00201 CRB<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Joshua Hernandez has filed a habeas petition alleging ineffective assistance of counsel because his trial lawyer failed to investigate his mental health history. Petitioner was charged with multiple counts of attempted murder, assault, and burglary, and pleaded not guilty by reason of insanity. A jury found him sane and he was sentenced to 22 years in prison. Petitioner claims that his lawyer failed to properly investigate Petitioner's history of mental illness, which would have rebutted the prosecution's primary theory at trial that Petitioner was malingering. Because there is no clearly established federal law supporting Petitioner's claim that his Sixth Amendment rights were violated by his counsel's failure to investigate his medical history, his petition for writ of habeas corpus is DENIED.

**I.   BACKGROUND**

Petitioner's convictions stem from two attacks that occurred on January 13 and 14, 2004. People v. Hernandez, No. A111239, 2007 Cal. App. Unpub. LEXIS 4571, at *2-*5

(Cal. Ct. App. June 7, 2007).[1]  The first incident occurred on the evening of January 13 when Petitioner entered a home, and stabbed and otherwise assaulted the occupants.  Id. at *2-*4.  The second incident took place the following morning, when Petitioner stripped naked and severally beat a caregiver at an assisted living facility.  Id. at *4-*5.

Petitioner was initially found incompetent to stand trial.  See Respondent's Exh. A at 126.  After almost a year at Atascadero State Hospital, Petitioner was restored to competency.  Id. at 143-44.  His only defense at trial was that he was not guilty by reason of insanity.  Id. at 173.  Petitioner's defense rested primarily on three experts: Dr. Michael Ramirez, a clinical psychologist who examined Petitioner only as to his competency to stand trial; Dr. Otto Vanoni, a forensic and clinical psychologist; and Dr. Robert Soper, a forensic psychiatrist.  Hernandez, 2007 Cal. App. Unpub. LEXIS 4571, at *5-*10.  Both Dr. Vanoni and Dr. Soper testified that Petitioner was legally insane at the time of the offenses.[2]  Id. at *6-*8.

The prosecution presented no expert testimony and instead put forth one primary theory: that Petitioner was faking his mental illness.  Specifically, the prosecution relied on letters written by Petitioner, while he was in Atascadero State Hospital, in which Petitioner described paranoid schizophrenia and a video he watched about a case in which a person was found not guilty by reason of insanity.  Ex. G at 522-23.  The prosecutor read a letter that Petitioner wrote to his mother, which stated in part: "A year ago, when I saw a video at Atascadero State Hospital, which showed a paranoid schizophrenic male who killed his mother with a sword and did not think it was wrong at the time, I immediately felt that I had something in common with this male because I knew at that time and still do, in parens, that I did not think at the time of the crime what I was doing was wrong."  Id. at 325.

Petitioner's experts relied on Petitioner's statements about his mental health, police reports, and a 10-page summary report from Atascadero State Hospital.  See id. at 127, 288.

---

[1] This appellate court decision did not address the issue currently before the Court, but does provide a clear summary of the facts applicable to the issue now before this Court.

[2] Dr. Ramirez did not testify that Petitioner was legally insane because he did not evaluate Petitioner for this purpose.

The 10-page summary included a section on Petitioner's mental health history, but it was entirely self reported. See Ex. F, Ex. A, at 1-4.

The only non-self reported evidence about Petitioner's mental history received into evidence at trial was a "body location" record from the Alaska prison department. Ex. G at 392-93. That document only showed that Petitioner was at the Alaska Psychiatric Institute on two occasions, but did not include any information on his condition or treatment. Id. The prosecution attacked this document in closing arguments because it lacked any description of Petitioner's disorder or diagnosis. Id. at 527-28. The prosecution argued:

> This is the only document that anybody has come up with in terms of his commitment to Alaska. We don't know – there's only a couple of things we know about it. We know it was in relation to criminal charges. . . . [and] he didn't spend a lot of time there, a little over sixty days in one stretch, nine days on the other. . . . [W]e don't know what experience he had up in Alaska.

Id.

Other than the body location record, Petitioner's lawyer relied exclusively on the Petitioner's own statements to establish his history of mental illness. The prosecution repeatedly used this lack of independent documentation about Petitioner's history of mental illness as evidence that Petitioner was faking his illness. See, e.g., id. at 513, 518-19, 521, 527-29, 535, 542. For example, during closing arguments the prosecution made the following statement to the jury:

> [N]o matter how you pretty up, no matter how you talk about history, no matter how you talk about footprints, it all comes back to one thing. The only evidence of hallucinations and delusions in this case and in the record is from the defendant himself. There is absolutely no objective, independent, reliable evidence this man ever had hallucinations or delusions. It all comes from him, from no one else.

Id. at 513.

The jury found petitioner sane on all eleven counts against him. Ex. G at 558-66. Petitioner was sentenced to 22 years in prison. Ex. A at 231-34. Petitioner filed a petition for writ of habeas corpus with the California Supreme Court, arguing that his lawyer provided ineffective assistance of counsel. In re Hernandez on Habeas Corpus, No.

3

S160888, 2009 Cal. LEXIS 604 (Cal. Jan. 14, 2009).³  Specifically, Petitioner alleged that his lawyer failed to "investigate his history of mental illness and failed to present evidence verifying his history of mental illness to support his defense. . . ."  Brief of Pet'r at 6, In re Hernandez on Habeas Corpus, 2009 Cal. LEXIS 604.  The California Supreme Court summarily rejected Petitioner's habeas petition.  In re Hernandez on Habeas Corpus, 2009 Cal. LEXIS 604 ("The petition for writ of habeas corpus is denied.").

Petitioner now alleges that trial counsel was ineffective because he failed to gather four specific groups of records that would have rebutted the prosecution's argument that Petitioner was faking his mental illness: (1) Petitioner's complete file from Atascadero State Hospital; (2) records from the Alaska Psychiatric Institute, where Petitioner was hospitalized in 2002 and 2003; (3) Petitioner's classification by the Social Security Administration as disabled in 1991; and (4) records from San Antonio State Hospital, where Petitioner was hospitalized three times in 1991, when he was 14-years-old.  Pet. for Writ of Habeas Corpus at 18-19.  These records were not gathered by Petitioner's trial counsel and were not in the public defender's files.  Ex. F, Ex. G ¶ 2.  They were, however, readily available.  See id. ¶ 3-4.  Petitioner's appellate counsel was able to gather the records after getting Petitioner's authorization for their release.  Id.

### a. **File from Atascadero State Hospital**

The Atascadero file contains reports from hospital staff describing Petitioner's mental state.  These files included Petitioner's initial assessment, which was done on May 31, 2004, 10 days after he was admitted to the hospital.  Ex. F, Ex. B at 45.  The report states that Petitioner was "severely impaired by delusions, moderately  impaired by paranoia and a thought disorder, and minimally impaired by hallucinations, anxiety, and denial."  Id. at 50.  The report indicated that Petitioner seldom displayed "recognition of the nature of his symptoms and how they affect[ed] his behavior" nor did he acknowledge "his need for

---

³ Petitioner presented other issues for habeas review in the California courts, but those issues are not before the Court.  See, e.g., Hernandez, 2007 Cal. App. Unpub. LEXIS 4571.

4

prescribed medication." Id. at 47. The report also states that he denied that instances of "assaultive behavior" were his responsibility. Id. at 48.

In a declaration to the California Supreme Court, Dr. Soper said that if he had seen these files before testifying, they would have provided "significant substantiation of [Petitioner's] psychosis in that they document the severity of his symptoms on admission, as observed and recorded by various mental health professionals, and the gradual improvement of his mental health. . . ." Ex. F, Ex. F ¶ 6.

### b. Alaska records

The Alaska records show that Petitioner was hospitalized at the Alaska Psychiatric Institute twice. The first time was from August 28 to September 4, 2002. Ex. F, Ex. C at 22. Petitioner was admitted in August with "prominent delusions with religious themes." Id. at 13. Petitioner refused medical treatment, saying it was a "spiritual matter." Id. Petitioner experienced "persistent and virtually continuous visual hallucinations which include seeing Satan, demons, and angels." Id. at 23. Petitioner also expressed "delusional beliefs" including the fact that he believed he was Jesus and that other people were "demons or possessed by demons." Id. at 23. He was discharged with no change in his condition. Id. at 13.

Petitioner was hospitalized in the facility again from November 15, 2002, to January 21, 2003, after being arrested. Id. at 20. Petitioner claimed that he was Jesus during his arrest. Id. at 4. After he was admitted, hospital staff had a difficult time interviewing Petitioner because of "extreme looseness of associations." Id. He also threatened to kill a former roommate because he thought the roommate was responsible for the terrorist attacks of September 11, 2001. Id. The report indicates that Petitioner's condition "improved significantly" once he started receiving treatment. Id. at 3.

These records offer far more information than the body location document that was submitted as evidence during trial. The body location document only showed where Petitioner was and how long he was there. See Ex. G at 392-93. In contrast, the files from the mental hospital explain in detail Petitioner's diagnosis and treatment. Dr. Soper declared

5

to the California Supreme Court after Petitioner's conviction that these "records provide very strong confirmation for my diagnosis and assessment of [Petitioner] and I would have testified to that effect if they had been available to me at the time of my testimony as [sic] trial." Ex. F, Ex F. ¶ 13. Dr. Soper also stated in the declaration that the records from Alaska "also would have significantly supported my conclusion that [Petitioner] was not malingering. These records show that his self reported history about being hospitalized there was entirely accurate. . . ." Ex. F, Ex. F ¶ 14.

### c. Social Security disability

The Social Security Administration declared Petitioner disabled due to a mental disorder on November 19, 1991. Ex. F, Ex. D at 2-3. However, the Social Security Administration was unable to locate the medical reports it relied on to make this determination. Id. at 1.

### d. San Antonio State Hospital Records

The records show that Petitioner was admitted to the San Antonio State Hospital three times in 1991, when he was 14 years old. Ex. F, Ex. E at 1. He was first admitted on March 6, 1991, and discharged on April 5, 1991. Id. He was admitted the first time because he was hearing voices telling him to commit suicide. Id. at 24. He was readmitted just days later, on April 14, 1991, because of further reports of hallucinations and aggressive behavior toward other children. Id. at 17. Prior to his second hospitalization, Petitioner also talked about killing himself, and engaged in self-mutilation. Id. He was readmitted a third time on June 24, 1991. Id. at 1. He again reported hearing voices. Id. at 2. This time, Petitioner claimed that he told doctors he was hearing voices because he wanted to get out of the group home he was staying in. Id. at 3-4. Upon discharge, medical staff reported that he showed no signs of hallucinations, or suicidal or homicidal thoughts. Id. at 2. He was diagnosed with post-traumatic stress disorder and discharged on July 3, 1991. Id. at 1-2.

Dr. Soper declared to the California Supreme Court that these records provide "significant" support for his diagnosis. Ex. F, Ex. F ¶ 20. "The San Antonio State Hospital records document symptoms of command hallucinations, aggressive behavior in response to

command hallucinations, and positive response to treatment with antipsychotic medication." Id.

## II. LEGAL STANDARD

### a. Habeas Standard

A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for the purposes of 28 U.S.C. § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced. Barker v. Fleming, 423 F.3d 1085, 1092 (9th Cir. 2005). It is not necessary that the decision on the merits be accompanied by a statement of the reasoning for § 2254(d) to be applied. Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

7

A federal court must be "highly deferential" to the state court. See Woodford v. Visciotti, 537 U.S. 19, 24 (2002). "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

"Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Richter, 131 S. Ct. at 786. "On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, 562 U.S. ___, ___ (2011) (slip op., at 4) (quoting Renico v. Lett, 559 U.S. ___, ___ (2010) (slip op., at 5).

### b. Strickland Standard

The Supreme Court established the standard for effective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). In Richter, 131 S. Ct. at 785, the Supreme Court recently stressed that "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable," which "is different from asking whether defense counsel's performance fell below Strickland's standard." "The standards created by Strickland and § 2254(d) are both 'highly deferential' . . . and when the two apply in tandem,

8

1  review is 'doubly' so." Id. at 788. The Court must ask not "whether counsel's actions were
2  reasonable" but "whether there is any reasonable argument that counsel satisfied Strickland's
3  deferential standard." Id.

4  Strickland's deferential standard is as follows: To prevail on a claim of ineffective
5  assistance of counsel, a habeas petitioner must demonstrate, first, that his counsel's
6  representation fell below an objective standard of reasonableness, and second, that he was
7  prejudiced by this deficient performance. Strickland, 466 U.S. at 687-89. In reviewing
8  defense counsel's performance, courts "must be highly deferential" and should make "every
9  effort to eliminate the distorting effects of hindsight." Id. at 689.

10  Again, this Court's task under § 2254(d) is not to undertake its own Strickland
11  analysis, but to determine whether the state court's Strickland analysis was unreasonable.
12  "To overcome the limitation imposed by 2254(d)," this Court would have to conclude that
13  whether the state court's conclusion was based on finding either that there was no deficient
14  performance or that there was no prejudice, "both findings would have involved an
15  unreasonable application of clearly established federal law." Premo v. Moore, 562 U.S. ___
16  (2011) (slip op.) at *7.

17  Here, the California Supreme Court issued only a one-sentence decision denying
18  habeas. This was a direct petition to the California Supreme Court, so there is no opinion
19  from an intermediate appellate court to rely on.[4] Therefore, the duty of this Court, under
20  Richter, is to determine whether any "arguments or theories" support the California Supreme
21  Court's decision. 131 S. Ct. at 786.

22  **III.   ANALYSIS**

23  A finding by the state court that trial counsel did not perform deficiently would have
24  been a reasonable application of Strickland because there is no clearly established federal law

---

[4] Petitioner filed a separate habeas petition with the Court of Appeal of the State of California, First Appellate District, Division Five. See People v. Hernandez, No. A111239, 2007 Cal. App. Unpub. LEXIS 4571 (Cal. App. Ct. June 7, 2007). That petition did not address this claim. Id. The claim of ineffective assistance because of a failure to properly investigate Petitioner's medical history was first brought in a separate petition for a writ of habeas corpus in the California Supreme Court on February 14, 2008. In re Hernandez on Habeas Corpus, 2009 Cal. LEXIS 604.

9

supporting Petitioner's claim. See § 2254(d). The first prong in the Strickland analysis requires showing that Petitioner's lawyer made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. See Strickland, 466 U.S. at 687. In general, a defense attorney has a duty to conduct a reasonable investigation or make a reasonable decision not to investigate. Id. at 690-91. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. . . ." Id. at 690. But even if a thorough investigation is not made, the decision not to investigate "must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 691. Counsel need not pursue an investigation that would be fruitless or harmful to the defense. See Richter, 131 S. Ct. at 789-90.

Numerous cases have addressed the issue of a trial lawyer failing to investigate the mental health of his client during the sentencing phase. For example, in Deutscher v. Whitley, the court held that the trial lawyer's performance was deficient when defense counsel failed to even consider investigating the defendant's mental history to establish mitigating circumstances during the penalty phase of the trial. 884 F.2d 1152, 1160 (9th Cir. 1989), vacated on other grounds, 506 U.S. 935 (1992); see also Rompilla v. Beard, 545 U.S. 374, 389 (2005) (holding that relying on statements from family and the defendant was unreasonable when a court file contained the information); Wiggins v. Smith, 539 U.S. 510, 524-25 (2003) (holding that it was unreasonable in a capital sentencing for counsel to prematurely abandon an investigation into the background of the defendant); Evans v. Lewis, 855 F.2d 631, 637 (9th Cir. 1988) (holding that the failure to investigate the possibility of mental impairment cannot be construed as a trial tactic where relevant available documents are not even reviewed by counsel). These cases, however, are distinguishable as they deal with sentencing.

In addition, in contrast to some of the authority cited by Petitioner, trial counsel did not fail altogether to put forward evidence of mental impairment. See e.g., People v. Corona, 80 Cal. App. 3d 684, 709 (Cal. Ct. App. 1978). Petitioner had the burden of proving that his

10

1 client was insane[5] and came forward with evidence to make that showing: two experts
2 testified that Petitioner was insane at the time of the incidents.  In addition, trial counsel
3 provided Petitioner's experts with the Atascadero State Hospital Discharge Summary, which
4 included an account of Petitioner's past hospitalizations, albeit a self-reported one.  Although
5 this Court would, in its independent judgment, not find this effort to be sufficient, counsel
6 might have decided that further investigation would be fruitless, and Petitioner has provided
7 the Court with no authority mandating a different conclusion.  Simply put, Petitioner has
8 failed to cite a case from the Supreme Court or the Ninth Circuit showing that it is
9 constitutionally deficient to fail to investigate the mental health history of a client during the
10 guilt phase of a trial.

11 The government further argues that trial counsel's failure to throughly investigate
12 Petitioner's mental history did not deprive Petitioner of reasonable representation because
13 there was no affirmative duty to collect background material for the defense experts.  The
14 government cites to Hendricks, which holds that there is no duty "to acquire sufficient
15 background material on which an expert can base reliable psychiatric conclusions,
16 independent of any request for information from an expert. . . ."  70 F.3d 1032, 1038 (9th Cir.
17 1995).  This is also a reasonable argument.

18 The information that Petitioner's lawyer failed to gather was not needed by the experts
19 to form their opinions.  See Exh. G at 359.  Dr. Soper testified that even if Petitioner had
20 "never gone to a hospital in Alaska, it really wouldn't make all that much difference" in
21 making his diagnosis.  Id.  The two experts were comfortable with their diagnoses without
22 Petitioner's mental health records.  See id.  Indeed, Petitioner might well have been so
23 mentally unstable that a mental health professional could diagnose him within minutes,
24 without reference to any background material.  But, aside from the preparation of experts,

---

[5] In California, a defendant must prove "by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."  Cal. Penal Code § 25(b); but see People v. Horn, 158 Cal. App. 3d 1014, 1032 (Cal. App. 3d Dist. 1984) (holding that the statute only requires that the defendant not know or understand the nature of his act or of distinguishing right from wrong, despite the use of and in the statute).

11

these records would likely have proven invaluable to the defense in defending its experts' conclusion that Petitioner was genuinely insane and had been suffering from severe mental illness for more than a decade. Petitioner's entire case rose and fell on the insanity issue – it was his only defense. This Court is uncomfortable with the notion that trial counsel may delegate entirely to the experts the decision of what investigation is needed in a case like this– rather than merely delegating to the experts the decision of what they need to reach their opinions. However, Petitioner has pointed to no clearly established federal law that would have required trial counsel to seek out information that was not needed by his experts in forming their opinions.

It was almost certainly imprudent for trial counsel to fail to gather Petitioner's medical records, but it falls short of inadequate assistance of counsel, especially when analyzed under the doubly deferential standard articulated in Richter, 131 S. Ct. at 788. There is a "reasonable argument that counsel satisfied Strickland's deferential standard." See id. Specifically, there is a reasonable argument that counsel met his constitutional obligation by retaining and preparing two experts who testified that Petitioner was insane at the time of the incidents. The missing records were not requested by the two experts and both testified that they did not need them to come to their expert conclusions. Finding ineffective assistance under these circumstances would require counsel to conduct an investigation deemed unnecessary by expert witnesses when presenting an insanity defense. Such a duty is not clearly established by federal law. See § 2254(d).

While it seems quite possible that these records would have altered the result of the trial, this Court declines to reach the issue of prejudice because Petitioner has failed to show that counsel's representation fell below an objective standard of reasonableness "clearly established" by federal law, "as determined by the Supreme Court of the United States." See § 2254(d); see also Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

## IV. APPEALABILITY

Without a certificate of appealability, "an appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding in which the detention complained

of arises out of process issued by a State court." 28 U.S.C. § 2253(c)(1). A court may grant a certificate of appealability ("COA") "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, a petitioner must show "the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. at 484.

"[T]he standard for obtaining a COA is not a particularly exacting one." Wilson v. Belleque, 554 F.3d 816, 826 (9th Cir. 2009). A prisoner seeking a COA must prove something more than "mere 'good faith.'" Miller-El v. Cockrell, 537 U.S. 322, 338 (2003). However, the petitioner need not show that "some jurists would grant the petition for habeas corpus." Id. Rather, a petitioner need only show that a claim is "debatable." Id. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Id.

Petitioner has not shown that the state court's "application of the Strickland standard was unreasonable." See Richter, 131 S. Ct. at 785. However, Petitioner has made a "substantial showing of the denial of a constitutional right" – specifically his Sixth Amendment right to effective assistance of counsel. See 28 U.S.C. § 2253(c)(2). Therefore, this Court GRANTS a COA with respect to Petitioner's claim that he was denied effective assistance of counsel.

**V.     CONCLUSION**

For the foregoing reasons, this Court DENIES the Petition for Writ of Habeas Corpus

//

//

//

13

but GRANTS a COA.

**IT IS SO ORDERED.**

Dated: May 6, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE